HAROLD PAGE, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—97—1621

Opinion filed September 30, 1998.

Cohn & Cohn, of Chicago (Charles A. Cohn and Erwin Cohn, of counsel), for appellant.

Legal Assistance Foundation, of Chicago (Vivian R. Hessel and Rachel Lokken, of counsel), for appellee Patricia Barnes.

Brian L. Crowe, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Joshua D. Davidson, Assistant Corporation Counsel, of counsel), for other appellees.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:
Plaintiff, Dr. Harold Page, filed this appeal of the circuit court's denial of his petition for writ of *certiorari* of several rulings of the City of Chicago's Commission on Human Relations (Commission). After Patricia Barnes filed a complaint against Page with the Commission alleging sexual harassment, the Commission awarded Barnes compensatory damages, punitive damages, a fine, costs and attorney fees. On appeal, Page asserts the circuit court and Commission erred in holding that: (1) the state legislature did not preempt the City of Chicago's home rule authority to prohibit sexual harassment and discrimination by small employers; (2) the Commission may award punitive damages; (3) there was sufficient evidence to support a finding of "hostile environment" sexual harassment under the Chicago human rights ordinance; (4) Barnes was entitled to $33,770.03 in attorney fees and $1,282.80 in costs; and (5) the Legal Assistance Foundation was entitled to fees for services provided by paralegal Elizabeth Singer. Page also contends that the circuit court erred in denying his motion to reinstate and amend his petition for *certiorari*.
We affirm.

I. FACTS
On January 2, 1992, Patricia Barnes filed her complaint against Dr. Harold Page with the Commission. She alleged that during her employment with Page, he sexually harassed her in violation of the

Chicago human rights ordinance (Ordinance) (Chicago Municipal Code § 2—160—020 (1990)).

At an evidentiary hearing before the Commission, Barnes testified that she worked part-time for Page from June 4, 1991, to September 14, 1991, as a medical assistant. In addition to clerical work, she worked with patients doing EKGs and assisted with ultrasound procedures. Page employed two other part-time employees during this period. At first, Page sexually harassed Barnes by telling offensive jokes. Although Barnes objected to the jokes and complained that it upset her, Page continued to tell the jokes. Page also joked about Barnes' relationship with her husband, commented about her appearance and on one occasion said to Barnes, "If you pay me, I'll have sex with you."

Barnes additionally testified that, on one occasion, Page sprayed an air freshener in front of her genital area. On another occasion, in front of a male patient, Page accused Barnes of allowing the patient to look up her skirt. When Barnes denied this, Page stated that Barnes was not wearing anything under her skirt because he could see "the red hairs on [her] vagina." Page also repeatedly called Barnes a lesbian, referred to her as "Patrick" and introduced her to his son by that name and allowed his son to call her "Patrick."

Barnes testified that, in a separate incident, Page improperly touched her shoulders. In addition, two days prior to Page firing Barnes, Barnes questioned why Page was touching an open sore on a patient's back and Page responded "Because you're going to lick it off anyway. Don't you lick your husband, don't you lick his stick?" On her last day of employment, Page and Barnes argued over questions Barnes asked a patient. Page then discharged Barnes.

Barnes testified that Page's actions upset and humiliated her. She described feeling uncomfortable, frightened and threatened. She claimed the remarks made her feel like the patients did not respect her. She was upset about the remarks even when she was away from the job and she testified she had difficulty sleeping. She repeatedly complained to Page about his conduct. Barnes acknowledged that, she could only recall five verbal incidents of sexual harassment and that, on the day she was discharged, she allowed Page to treat her daughter for a spinal condition.

Other witnesses testified about Page's improper conduct. Patient Lillette Erby stated that, while Page treated her, he pulled her underwear completely below her buttocks and that, after she pulled the underwear up, he pulled it down again. Erby's daughter testified about this incident and also testified that Page told sexual jokes. Fronnie Echols testified that she was a patient of Page during Barnes'

employment. Once, during treatment, she was groaning in pain and Page told her that she sounded like she was having good sex. Echols further heard Page tell Barnes that her skirt was too short even though her skirt fell below her knees.

Dr. Louise Fitzgerald, a psychologist, testified as an expert witness in the area of sexual harassment. She stated that Barnes was experiencing moderate posttraumatic stress disorder related to sexual harassment. According to Dr. Fitzgerald, Page's harassment caused Barnes to sustain emotional distress and depression.

Page testified in his own defense. He denied ever making sexual comments to Barnes or discussing her personal appearance. He also stated that he never told Barnes he could see her pubic hair or joked about Barnes' relationship with her husband. Page further denied spraying Barnes with air freshener. Page testified that Barnes never complained to him about any acts of sexual harassment. Moreover, he denied any inappropriate conduct with Lillette Erby. Page stated that Barnes was fired because she was late, interrupted his treatment with a patient and caused an argument.

Page called three additional witnesses to support his testimony. Cheran Isaac, a part-time employee of Dr. Page, testified that she never saw Page act inappropriately or commit any acts of sexual harassment. Angelo Donegan, a patient of Page, also denied witnessing any sexual harassment of Barnes. Ruth Morton, a friend of Page, testified that Page always acted professionally with his patients and employees. She, however, admitted that she had minimal contact with Page since the early eighties.

The Commission found that "hostile environment" sexual harassment had occurred, but "quid pro quo" harassment had not occurred. The Commission held that Barnes was subject to a hostile working environment and offensive acts. As a result, Page had violated section 2—160—040 of the Chicago human rights ordinance. The Commission awarded Barnes $5,000 in compensatory damages and $1,000 in punitive damages. The Commission also fined Page and ordered him to pay Barnes' attorney fees and costs. Barnes then submitted a petition for attorney fees and costs to the Commission. Barnes sought fees based on representation by two attorneys, Bridget Arimond and Elizabeth Singer. After a hearing, the Commission ordered Page to pay $38,785.50 in attorney fees for both of Barnes' attorneys and $1,282.80 in costs.

On February 18, 1994, Page filed a petition for writ of *certiorari* in the circuit court of Cook County. In a February 10, 1995, order, the circuit court affirmed all of the rulings of the Commission except for an award of attorney fees to Elizabeth Singer. The circuit court vacated

the attorney fees awarded to Singer and remanded the issue of her fee award to the Commission. The court noted that during Singer's representation of Barnes before the Commission, she was not licensed to practice law in Illinois but was a member of the Maryland bar.

On remand, the Commission granted Barnes' motion to supplement the record with Singer's affidavit and to admit her as an attorney in this case retroactively. Therefore, on May 15, 1996, the Commission found that Singer properly appeared as an attorney during her representation of Barnes and ordered her compensated as previously determined. In the alternative, the Commission set an hourly rate for her compensation as a paralegal if the circuit court found that she could not appear as an attorney.

On June 14, 1996, the circuit court granted Page leave to file an amended petition for writ of *certiorari* to contest the Commission's award of attorney fees to Singer. On October 15, 1996, the circuit court ruled that the Commission improperly held that Singer was entitled to fees as an attorney and that the Commission erred in retroactively admitting her in this case. The circuit court then ordered the Commission on remand to calculate "a final determination" of fees for Singer.

On February 17, 1997, the Commission ordered Singer compensated as a paralegal. Relying on its previous determination, the Commission ordered that Singer's hourly rate for her work should be $75 an hour and awarded her total fees of $10,378.37. The Commission recalculated its total attorney fees award for Barnes to $33,770.03. On March 19, 1997, Page filed a motion in the circuit court to reinstate his previous filed writ of *certiorari* and for leave to file an additional count to his petition. Page sought to challenge the fee award to Singer as a paralegal. On March 27, 1997, the circuit court denied both motions and entered a final order in this case. On April 18, 1997, Page filed his notice of appeal.

II. Jurisdiction

Both the City of Chicago (the City) and Barnes argue that this court lacks appellate jurisdiction of all the Commission and circuit court holdings. Barnes contends that the circuit court's October 15, 1996, remand order was a final order. Therefore, after the Commission entered its fee order on February 19, 1997, Page was required to file a new petition for writ of *certiorari* in the circuit court to preserve all issues for appellate review.

The City asserts that the circuit court's order of October 15, 1996, was substantively final and appealable. Therefore, the City contends that Page was required to file an appeal within 30 days of this order.

Because Page failed to file a timely appeal, the City asserts that the only issue properly before this court is the circuit court's denial of Page's motion to reinstate the *certiorari* proceedings.

■ To obtain appellate jurisdiction, a party must file a notice of appeal within 30 days of the judgment challenged. 155 Ill. 2d R. 303; *Martin v. Cajda*, 238 Ill. App. 3d 721, 728, 606 N.E.2d 566 (1992). The order appealed from must be final. *Wilkey v. Illinois Racing Board*, 96 Ill. 2d 245, 249, 449 N.E.2d 843 (1983). A court's order of remand to a lower court or an agency does not automatically render that order nonfinal. *Wilkey*, 96 Ill. 2d at 249. Rather, to determine the finality of an order, the court must examine " 'whether the judgment fully and finally disposes of the rights of the parties to the cause so that no material controverted issue remains to be determined.' " *Wilkey*, 96 Ill. 2d at 249, quoting *Cory Corp. v. Fitzgerald*, 403 Ill. 409, 414, 86 N.E.2d 363 (1949).

■ A circuit court's remand to an administrative agency is not final if the circuit court orders a new hearing (*Lippert v. State Property Tax Appeal Board*, 273 Ill. App. 3d 150, 153, 652 N.E.2d 461 (1995)) or if the remand involves disputed questions of facts or law (*Martin*, 238 Ill. App. 3d at 238). In these circumstances, the circuit court retains jurisdiction over the agency's action on remand. *Lippert*, 273 Ill. App. 3d at 153.

Neither the City nor Barnes contends that the circuit court's initial remand order to the Commission on February 10, 1995, was final and appealable. In that order, the court affirmed the Commission's finding of liability against Page and award of damages, costs and attorney fees to Barnes. The circuit court, however, found that a compensation award for Elizabeth Singer had to be redetermined because she was not an attorney licensed to practice law in Illinois. Thus, the circuit court's remand order required the Commission to hold a hearing and determine legal and factual issues as to Singer's status at the time she represented Barnes. On remand, the Commission ruled that Singer properly appeared in this case as an attorney and thus was entitled to fees as an attorney. In the alternative, the Commission calculated a fee for Singer as a paralegal. Consequently, during the proceedings following the initial remand, the Commission made legal and factual determinations regarding Singer's professional representation of Barnes.

The City and Barnes, however, contend that the circuit court's October 15, 1996, remand order was final because the Commission was only required to enter a previously determined fee amount for Singer. A review of the court's order undercuts this argument. In the October 15, 1996, order, the circuit court found that "Elizabeth Singer

was not an attorney admitted in Illinois" and was not entitled to compensation as an attorney. The court then remanded the action "for a final determination as to fees, if any, for services of Elizabeth Singer." The court's order required the Commission to make a factual determination of fees for Singer's legal services as a nonattorney. A disputed factual issue remained before the Commission and the court's October 15, 1996, remand order was nonfinal.

The City's reliance on *Martin v. Cajda* is unpersuasive. In *Martin*, the superintendent of the Chicago police department filed a complaint for administrative review in the circuit court of the police board's order suspending an officer for his failure to comply with a residency requirement. *Martin*, 238 Ill. App. 3d at 723. The police department argued that the police officer should be discharged rather than suspended. The circuit court held that the police board erred because the statute mandated discharge. *Martin*, 238 Ill. App. 3d at 723. The court then remanded the action to the police board for an order entering the discharge of the officer. *Martin*, 238 Ill. App. 3d at 724. The appellate court found that this order was final because the police board was left with no factual or legal issues to decide. The circuit court solely ordered the agency to discharge the officer. *Martin*, 238 Ill. App. 3d at 727.

■ In the case at bar, the circuit court's October 15, 1996, order did not command the Commission to enter a specific order as to Singer's fees. Unlike the specific directive in *Martin*, the circuit court's order did not require the Commission to award a previously determined compensation fee for Singer. Instead, the court directed the Commission to redetermine Singer's fees based on her nonattorney status. The court thus remanded the issue to the Commission to decide a disputed factual issue. Following the October 15, 1996, order, the circuit court retained jurisdiction over the Commission's actions.

Barnes' argument that Page was required to file a new petition for *certiorari* after the Commission's February 17, 1997, order is equally unpersuasive. In *Lippert*, the court addressed the procedures a party must follow to have the circuit court review an agency's action following remand. *Lippert*, 273 Ill. App. 3d at 154. The court noted that once an administrative review is filed in the circuit court, the court retains jurisdiction of the case until "final disposition." Therefore, the court found that a circuit court's order as to an agency action does not become final and appealable until the additional proceedings are concluded. *Lippert*, 273 Ill. App. 3d at 154.

In this case, the circuit court retained jurisdiction following its October 15, 1996, remand to the Commission. The court's jurisdiction originated from Page's initial petition for writ of *certiorari*. Page

therefore was not required to file a new petition for writ of *certiorari* following either remand to the Commission in 1995 or 1996. Page properly waited until the circuit court ruled on the Commission's finding after both remands before invoking the jurisdiction of this court. Consequently, we find that the circuit court's March 27, 1997, order was the first final and appealable order entered in this case. Page timely filed his notice of appeal within 30 days and thus we will review the issues he raises in his appeal.

III. The Chicago Human Rights Ordinance is a Proper Exercise of Home Rule Authority

Page first argues that the Illinois Human Rights Act (Human Rights Act) prevents Chicago from defining employer differently than it is defined in section 7—108(a) of the Human Rights Act. 775 ILCS 5/7—108(A) (West 1996). Page maintains that because he cannot be an "employer" under the Human Rights Act, he therefore cannot be an employer under the Ordinance and is not subject to its provisions regarding sexual harassment.

Page challenges the home rule power of the City of Chicago to prohibit acts of sexual harassment and discrimination by small employers. Section 2—160—020(d) of the municipal code of Chicago and part 100, section 11, of the rules and regulations governing the Chicago human rights ordinance prohibit sexual harassment and discrimination by individuals who employ "one or more employees." However, Page notes that section 2—101(B)(1)(a) of the Human Rights Act defines an employer as "[a]ny person employing 15 or more employees within Illinois during 20 or more calendar weeks within the calendar year of or preceding the alleged violation." 775 ILCS 5/2—101(B)(1)(a) (West 1996). Page then points out that he could not be subject to a violation under the Human Rights Act because at the time he employed Barnes, he only had one other employee. Thus, Page argues, section 2—101 of the Human Rights Act limits the City of Chicago's home rule powers to legislate civil rights violations for employers of less than 15 individuals.

■ The Illinois Constitution creates broad home rule powers, and home rule units may exercise and perform any function pertaining to their government and affairs, including regulation for the protection of the public health, safety, morals and welfare. *Beverly Bank v. County of Cook*, 157 Ill. App. 3d 601, 510 N.E.2d 941 (1987). This power is not dependant on any grant of power by the General Assembly. *Triple A Service, Inc. v. Rice*, 131 Ill. 2d 217, 545 N.E.2d 706 (1989).

Specifically, section 6(i) of article VII of the Illinois Constitution provides:

"Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i).

In addition, the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m). Illinois courts have recognized that home rule units are given broad powers to legislate. *City of Chicago v. Roman*, 292 Ill. App. 3d 546, 551, 685 N.E.2d 967 (1997).

■ An examination of the validity of home rule authority requires the court to determine whether the questioned home rule ordinance is related to its government and affairs and whether the state legislature has preempted the exercise of the home rule power. *Village of Bolingbrook v. Citizens Utility Co.*, 158 Ill. 2d 133, 136, 632 N.E.2d 1000 (1994). Page does not contend that the City's regulation of employment discrimination and sexual harassment is not within the City's home rule powers. Page recognizes that the issues of employment discrimination and sexual harassment relate to the public welfare of the City and affect its local welfare and economy. *Bolingbrook*, 158 Ill. 2d at 138-39. See also *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501, 470 N.E.2d 266 (1984). However, Page asserts that the Human Rights Act preempts the City from prohibiting sexual discrimination and employment discrimination of small employers such as Page.

■ We disagree. Sections 6(g) and 6(h) of the Illinois Constitution provide methods under which the state legislature may preempt home rule authority. Ill. Const. 1970, art. VII, §§ 6(g), 6(h). The legislature may preclude home rule authority in an area not regulated by the state through a three-fifths majority vote; and, in addition, the legislature may "provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit." Ill. Const., art. VII, §§ 6(g), 6(h). Our supreme court has noted that these two sections are "the exclusive methods by which the legislature may preempt a home rule power." *Kalodimos*, 103 Ill. 2d at 503. Therefore, unless the legislature is specific on preemption, courts will not restrict home rule authority. *Roman*, 292 Ill. App. 3d at 551.

■ We find no such preemption with regard to the prohibition of sexual harassment and its applicability to employers who have less than 15 employees. In order to meet the preemption requirements of section 6 of the Illinois Constitution, legislation must contain "express language that the area covered by the legislation is to be exclusively controlled by the state; it is not enough that the state comprehensively

regulate[d] an area that otherwise would fall into home rule power." *Roman*, 292 Ill. App. 3d at 552.

Consistent with these two constitutional provisions, the General Assembly, through legislation on home rule authority and the Human Rights Act, permits the home rule regulation of sexual discrimination and harassment by small employers as contained in section 2—160—020(d) of the municipal code of Chicago and part 100, section 11, of the rules and regulations governing the Chicago human rights ordinance. Section 7 of the Statute on Statutes states:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 1996).

The General Assembly enacted the Human Rights Act in 1979. Pub. Act 81—1216, eff. July 1, 1980. Therefore, unless the Human Rights Act specifically limits a home rule's power to regulate small employers, the City's ordinance regulating sexual harassment and discrimination is valid. See 775 ILCS 5/7—108(D) (West 1996) (specifically limiting home rule power which prohibits, restricts, narrows or limits the housing choice of any person).

In fact, the Human Rights Act encourages home rule power to so regulate. Section 7—108(A) of the Human Rights Act provides:

> "A political subdivision, or two or more political subdivisions acting jointly, may create a local department or commission as it or they see fit to promote the purposes of this Act and to secure for all individuals within the jurisdiction of the political subdivision or subdivisions freedom from unlawful discrimination, sexual harassment in employment and sexual harassment in higher education." 775 ILCS 5/7—108(A) (West 1996).

This provision further notes that the provisions of any ordinance enacted by any municipality which prohibit broader or different categories of discrimination than are prohibited by this act are "not invalidated or affected by this Act." 775 ILCS 5/7—108(A) (West 1996). While the phrase "categories of discrimination" may not explicitly refer to the number of employees needed to constitute an "employer" under a municipal ordinance, this provision does not preclude a determination that such a provision would be a proper exercise of home rule power. We do not believe this provision nor any other provision in the Illinois statutes prohibits a municipality from defining "employer" differently than it is defined in the Human Rights Act. As noted above,

limitations on home rule power must be specifically stated. The General Assembly has not so provided in this situation, and thus the home rule power to regulate an employer who has less than 15 employees is not preempted by the Human Rights Act.

In 1983, section 7—108(A) of the Human Rights Act was amended to overrule a fourth district case that held that local governments could not enact ordinances broader in scope than the Human Rights Act. *Hutchcraft Van Service, Inc. v. Urbana Human Relations Comm'n*, 104 Ill. App. 3d 817, 433 N.E.2d 329 (1982). Under section 7—108(A), the legislature intended for home rule units to legislate broader categories of discrimination than under the Human Rights Act. Therefore, the Human Rights Act contains no express limitation of a home rule unit's power to regulate sexual harassment and discrimination in the workplace. The City of Chicago may regulate employers smaller than employers defined in the Illinois Human Rights Act. Section 2—160—020(d) of the Chicago Municipal Code is a valid exercise of home rule power. Chicago Municipal Code § 2—160—020 (1990).

Page's reliance on *Baker v. Miller*, 159 Ill. 2d 249, 636 N.E.2d 551 (1994), is misplaced. In *Baker*, the plaintiff sued her former employer for sexual discrimination under article I, section 17, of the Illinois Constitution. Ill. Const. 1970, art. I, § 17. The defendant employed less than 15 individuals and thus was not subject to the Human Rights Act. 775 ILCS 5/2—101(B)(1)(a) (West 1996). Plaintiff therefore contended that, although she could not file a claim for discrimination under the Human Rights Act, she could file a direct action under the constitution. *Baker*, 159 Ill. 2d at 266. Our supreme court rejected this argument and dismissed plaintiff's cause of action. The court held that section 17 of the constitution recognized reasonable exemptions to the legislature's ability to regulate against unlawful discrimination. *Baker*, 159 Ill. 2d at 258-59. The court further noted that the Human Rights Act was the implementing legislation for section 17 of the Illinois Constitution and thus was the exclusive remedy for a section 17 violation. *Baker*, 159 Ill. 2d at 252-53. The supreme court reasoned that because the legislature chose not to regulate small employers under the Human Rights Act, the legislature also chose not to regulate small employers under section 17 of the constitution.

Page contends that if the legislature intended in the Human Rights Act to exempt small employers from a direct action under section 17 of the Constitution, the legislature also intended to preempt home rule units from prohibiting sexual discrimination and sexual harassment by small employers. Page's reliance on *Baker*, however, is fundamentally flawed. *Baker* does not address a home rule unit's power to regulate employment discrimination and harassment concur-

rently with the State. Consequently, the Human Rights Act does not preempt the City of Chicago's power to prohibit sexual discrimination and harassment by employers with less than 15 employees. Because Page employed at least one employee at the time of Barnes' complaint of sexual harassment, he is subject to the Ordinance.

In sum, the Human Rights Act contains no specific language limiting a home rule unit's power with regard to the applicability of sexual harassment laws, as required for the preemption of home rule power. Accordingly, we believe a home rule unit has the power to broaden the applicability of harassment prohibitions to employers with less than 15 employees, and we find that such an exercise of home rule power is proper under the Illinois Constitution and Illinois statutes.

IV. The Human Rights Ordinance Authorizes the Commission to Award Punitive Damages

■ Page next asserts that the Commission may not award punitive damages. Section 2—120—510(l) of the Ordinance authorizes the Commission:

> "[t]o render a decision upon the conclusion of a hearing, or upon receipt of a hearing officer's recommendation at the conclusion of a hearing, including finding of fact relating to the complaint, and to order such relief as may be appropriate under the circumstances determined in the hearing. Relief may include but is not limited to an order: *** to pay actual damages, as reasonably determined by the Commission, for injury *** suffered by the complainant." Chicago Municipal Code § 2—120—510(l) (1990).

■ ■ Courts will defer to an agency's interpretation of the statute that it is charged to enforce. *City of Decatur v. American Federation of State, County & Municipal Employees, Local 268*, 122 Ill. 2d 353, 361, 522 N.E.2d 1219 (1988). Courts must also interpret a statue within the plain meaning of the statute's words. *Pappas v. Calumet City Municipal Officer's Electoral Board*, 288 Ill. App. 3d 787, 790, 681 N.E.2d 589 (1997). The purpose in awarding punitive damages is to punish an individual responsible for the wrongful conduct, to teach the individual not to repeat the wrongful conduct and to deter others from similar conduct. *Duignan v. Lincoln Towers Insurance Agency, Inc.*, 282 Ill. App. 3d 262, 270, 667 N.E.2d 608 (1996).

■ In this case, the Ordinance calls for such "relief as may be appropriate" and does not limit the relief to specific damage categories or exclude punitive damages. Chicago Municipal Code § 2—120—510(1) (1990). The Commission has interpreted this language to include punitive damages. Moreover, the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1994)), which

contains similar language for relief, has been interpreted to include punitive damages. See *Smith v. Prime Cable*, 276 Ill. App. 843, 858, 658 N.E.2d 1325 (1995). Further, punitive damages constitute an appropriate remedy for acts of sexual discrimination and harassment. By awarding punitive damages in cases of sexual harassment and discrimination, the Commission can punish individuals responsible for the wrongful conduct, prevent them from sexually harassing or discriminating against others, and deter others from committing similar acts. We cannot find any reason that the City would exclude the ability to recover punitive damages in an area where it would be highly appropriate and necessary.

Again, Page's reliance on *Baker v. Miller*, 159 Ill. 2d at 252-53, is unpersuasive. In *Baker*, the court noted that the Human Rights Act does not specifically provide a punitive damage remedy. Unlike the Ordinance at issue, however, the Human Rights Act expressly limits its remedies to relief identified within the Act. 775 ILCS 5/8A—104 (West 1996). Moreover, a home rule unit's power does not originate from state legislation but, rather, a home rule unit draws its powers from the Illinois Constitution and exists independent of any statute. *Triple A Services, Inc.*, 131 Ill. 2d at 230. Consequently, the circuit court correctly affirmed the Commission's award of punitive damages to Barnes.

V. The Circuit Court Correctly Determined that the Commission's Findings are Supported by the Record and are not Against the Manifest Weight of the Evidence

■ Page next asserts that the Commission's finding that Barnes was subject to a hostile environment of sexual harassment and awarding Barnes damages was against the manifest weight of the evidence. On appeal, the agency's findings on questions of fact are to be held *prima facie* true and correct. 735 ILCS 5/3—110 (West 1992). "Judgment is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or when the finding appears to be unreasonable, arbitrary, or not based upon the evidence." *Jackson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 293 Ill. App. 3d 694, 698, 688 N.E.2d 782 (1997). The reviewing court cannot reweigh the evidence, the credibility of a witness, or the reasonable inferences to be drawn from the evidence. *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 681, 658 N.E.2d 1301 (1995). Therefore, the agency's decision must be sustained if a review of the record reveals any evidence to support the decision. *Atkins v. City of Chicago Comm'n on Human Relations ex rel. Lawrence*, 281 Ill. App. 3d 1066, 1074, 667 N.E.2d 664 (1996).

■ Section 2—160—020(l) of the Ordinance makes it unlawful for an employer to engage in sexual harassment. The Ordinance defines sexual harassment as:

"[A]ny unwelcome sexual advances or requests for sexual favors or conduct of a sexual nature when (i) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or (2) submission to or rejection of such conduct by an individual is used as the basis for any employment decision affecting the individual; or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." Chicago Municipal Code § 2—160—020(l) (1990).

The Ordinance codifies the Supreme Court's ruling in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). In *Meritor*, the Supreme Court held that either *quid pro quo* or hostile environment sexual harassment is actionable under title VII of the Civil Rights Act. *Meritor*, 477 U.S. at 64-66, 91 L. Ed. 2d at 57-58, 106 S. Ct. at 2404-05.

■ The Commission found that Page did not commit *quid pro quo* sexual harassment when he terminated Barnes but caused a "hostile or offensive working environment" in violation of section 2—160—020(l)(3) of the Ordinance. The Commission heard testimony from Barnes and three other witnesses about Page's conduct. Page made sexual jokes to Barnes, commented about her appearance, and made references to her sexual relationship with her husband. Two of Page's patients corroborated Barnes' testimony regarding Page's sexually offensive and hostile comments. While Page denied performing any acts of sexual harassment, it was the Commission's responsibility to assess witness credibility and weigh the evidence before it. The Commission found the testimony of Page to be not credible, and his denials to be incomplete and unconvincing. Based on the testimony of Page's unwanted and offensive conduct toward Barnes, we will not disturb the Commission's factual findings.

Page argued that even if Barnes' testimony was true, Page still could not have committed sexual harassment under the Ordinance because Barnes' own conduct demonstrates that she never perceived that she was sexually harassed. Page asks this court to reevaluate Barnes' testimony. Indeed, the Commission did not accept all of Barnes' testimony. It found that her termination was unrelated to any acts of sexual harassment committed against her.

However, the Commission held that a woman in Barnes' position would experience and perceive an offensive and hostile working

environment. Barnes' testimony supports her assertions that Page's sexual harassment caused her embarrassment, depression and mental anguish. Indeed, the record contains substantial evidence that Barnes experienced an offensive and hostile working environment in violation of the Ordinance.

The case *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995), cited by Page as factually similar to the case at bar, is in fact distinguishable. In *Baskerville*, the plaintiff, a secretary, alleged she was sexually harassed by her supervisor in the form of several comments made over the course of about seven months. The court found that the supervisor's comments did not "cross the line" from nonactionable vulgarity to potentially actionable sexual harassment, basing this determination on the nature of the comments and the infrequency. The court noted:

> "Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. [Citations.] On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville*, 50 F.3d at 430.

We agree that, in some cases, it is difficult to draw the line between actionable sexual harassment and nonactionable crude or distasteful remarks. However, there is ample support in the record for the Commission's findings that Page's behavior did cross the line. Here, the comments were concentrated into a short period of 14 weeks. The comments began with offensive jokes and progressively became more personal. Unlike *Baskerville*, the conduct at issue here included physical contact and at least one sexual proposition. Further, several incidents of harassment took place in front of patients. The conduct in the present case was much more than occasional offensive remarks or the "handful of comments spread over months" at issue in *Baskerville*. The Commission found that Page told certain jokes and made comments about Barnes' sexual relationship with her husband repeatedly for weeks at a time. The consistent harassment was intertwined with Barnes' job, and she could not escape or ignore the behavior.

We agree with the trial court's assessment that the Commission's evaluation of the evidence, its decision and the opinion were well reasoned and proper. Consequently, the Commission's decision was not against the manifest weight of the evidence.

VI. The Commission's Decision Entered January 20, 1994, Awarding Fees and Costs should be Upheld

Page further argues that the circuit court erred in affirming the

Commission's award of attorney fees of $33,770.03 and $1,282.80 costs to Barnes. Page challenges the time Barnes' attorney spent on the case, the issues that her attorney raised, and the need for the testimony of a psychologist. Page never objected to Barnes' request for costs before the Commission and thus he waived this issue for review. *S.W.*, 276 Ill. App. 3d at 679.

■ An award of attorney fees is within the discretion of the trier of fact and, on review, the court will not conduct a *de novo* review of the appropriateness of the fee award. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 494, 672 N.E.2d 1136 (1996); *Harris Trust & Savings Bank v. American National Bank & Trust Co.*, 230 Ill. App. 3d 591, 595, 594 N.E.2d 1308 (1992). Section 2—120—510(l) of the Ordinance authorizes the Commission to award attorney fees and costs "incurred in pursuing the complaint before the Commission." Chicago Municipal Code § 2—120—510(l) (1990). A petition that presents competent evidence of an attorney's actual hours and standard fee provides a reasonable basis for the award of attorney fees by the trier of fact. *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339, 355, 541 N.E.2d 1248 (1989).

■ In the present case, Barnes' attorney presented the Commission with a petition for attorney fees and costs. In the petition, Barnes' attorney detailed the hours she worked on this case and her standard rate for fees and attached affidavits and documentation in support of the petition. Page filed objections to the petition before the Commission. After a hearing, the Commission carefully examined the evidence before it and submitted a written order specifying its award of attorney fees. In fact, the Commission awarded fees for less hours than Barnes' petition sought. The Commission also reduced the total attorney fee award by 15% because Barnes was not successful on all her claims.

On remand, the Commission again evaluated the evidence for attorney fees and recalculated Elizabeth Singer's fee after it was determined that she could not have represented Barnes as an attorney in Illinois. See Chicago Municipal Code § 2—120—510(l) (1990); Commission Rules and Reg. § 270.120 (1992) (authorizing the Commission to award fees for the service of nonattorneys).

Page argues that the award of attorney fees must be proportional to the damage award. In *Rackow v. Illinois Human Rights Comm'n*, 152 Ill. App. 3d 1046, 1064, 504 N.E.2d 1344 (1987), the court addressed the lack of proportionality between a damage award and an attorney fee award in a discrimination action. The court noted that an award of attorney fees is required to ensure that individuals filing

complaints, who are often economically disadvantaged, receive proper representation and to enforce the public policy goals behind the legislation. *Rackow*, 152 Ill. App. 3d at 1064. The availability of an attorney fees award both encourages citizens to bring suit when their rights have been violated and provides incentives for attorneys to undertake representation in socially beneficial cases where the potential monetary recoveries are minimal. *Becovic v. City of Chicago*, 296 Ill. App. 3d 236, 694 N.E.2d 1044 (1998).

Here, the Commission's award of attorney fees protects the Ordinance's purpose of prohibiting sexual harassment in the workplace. In addition, the Commission received substantial evidence regarding the amount of time Barnes' attorney and Singer spent representing Barnes and properly reviewed this evidence prior to awarding fees. Therefore, the Commission did not abuse its discretion in awarding attorney fees to Barnes.

■ Page lastly contends that the circuit court erred in denying Page's motion for leave to reinstate the *certiorari* proceedings. Courts should liberally allow litigants to amend their pleadings "on just and reasonable terms" before final judgment. 735 ILCS 5/2—616 (West 1996). However, parties do not have an absolute right to amend their pleadings and a circuit court's denial of a party's motion to file an amended pleading is reviewed under an abuse of discretion standard. *Simon v. Wilson*, 291 Ill. App. 3d 495, 508, 684 N.E.2d 791 (1997). Courts additionally have discretion to deny a writ of *certiorari*. *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 428, 551 N.E.2d 640 (1990).

In the case at bar, Page argued in his pleading to reinstate the *certiorari* proceedings and for leave to file an additional count that Singer was not entitled to be compensated as a paralegal because, during the proceedings before the Commission, she was never disclosed as a paralegal. However, prior to a hearing before the Commission, Singer complied with the Commission's rules for an appearance by an out-of-state attorney and disclosed that she was not a member of the Illinois bar on her appearance form. Barnes' attorney therefore never misrepresented Singer's status to the Commission or Page.

The circuit court found that it had already ruled that Singer was entitled to compensation and that it was improper for Page to raise this issue again in an amended pleading. An amended pleading's attempt to relitigate an issue previously decided in the circuit court may be denied as cumulative or untimely filed. *National Educational Music Co. v. Rieckhoff*, 292 Ill. App. 3d 260, 263, 684 N.E.2d 1084 (1997). Consequently, the circuit court did not abuse its discretion in denying Page's leave to reinstate the *certiorari* proceedings and amend his petition.

For the foregoing reasons, we affirm the decisions of the circuit court and the Commission.

Affirmed.

TULLY AND GALLAGHER, JJ., concur.