# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437**

---

| | |
|---|---|
| Appellate Court Caption | JIMMY CRITTENDEN and JIMMY'S PLACE, Petitioners-Appellants, v. COOK COUNTY COMMISSION ON HUMAN RIGHTS and LYNITA BOYD, Respondents-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2437 |
| Filed<br>Rehearing denied | June 1, 2012<br>July 31, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from respondent's allegations of sexual harassment by her employer in violation of the Cook County Human Rights Ordinance, the appellate court upheld the trial court's confirmation of the Cook County Commission on Human Rights' award of lost wages as compensatory damages and rejected petitioners' challenge of respondent's credibility and their claim that the Commission considered hearsay evidence, since nothing in the record indicated that the finding that respondent's testimony was credible was against the manifest weight of the evidence, and any error arising from the hearing officer's consideration of hearsay evidence concerning the conduct of respondent's family was harmless; however, the award of punitive damages was reversed on the ground that punitive damages are not permitted by the ordinance. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-2719; the Hon. Sophia Hall, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |

Counsel on
Appeal

Lonny Ben Ogus, of Chicago, for appellants.

Anita M. Alvarez, State's Attorney, of Chicago (Maureen O. Hannon, Assistant State's Attorney, of counsel), for appellees.


Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent Lynita Boyd claimed that she was sexually harassed by petitioner Jimmy Crittenden while at work as a bartender at petitioner Jimmy's Place, where Crittenden was the manager. Respondent Cook County Commission on Human Rights (the Commission) agreed, awarding Boyd $41,670 in lost wages, $5,000 as compensatory damages, and $5,000 as punitive damages. Petitioners appealed the decision by petitioning for a writ of *certiorari* with the circuit court of Cook County, and the circuit court denied the petition and affirmed the Commission's decision. Petitioners now appeal to the appellate court, challenging Boyd's credibility, the Commission's purported consideration of hearsay evidence, and the damages award. For the reasons that follow, we affirm in part and reverse in part.


¶ 2                                    BACKGROUND

¶ 3    On November 15, 2006, Boyd filed a verified complaint with the Commission, alleging that she had been sexually harassed by Crittenden on July 19, 2006, in violation of the Cook County Human Rights Ordinance (the Ordinance) (Cook County Code of Ordinances § 42-30 *et seq.* (amended Nov. 19, 2002)). Boyd served as a bartender at Jimmy's Place in Riverdale from August 2003 through July 19, 2006, and performed her job duties satisfactorily. She alleges that on July 19, 2006, Crittenden sexually harassed her, including "asking [her] to have sex with [Jimmy's Place] customer Rachel (last name unknown), touching [her] and asking [her] to touch Rachel in a sexually explicit manner." Boyd attempted to ignore and discourage Crittenden's behavior, but Crittenden persisted. Boyd alleges that she has not worked at Jimmy's Place since the incident and filed a police report against Crittenden, resulting in criminal charges and a criminal trial on October 27, 2006.

¶ 4    On December 27, 2006, a response was filed by Amelia Crittenden on behalf of Jimmy's Wife's, Inc., the owner of Jimmy's Place. According to the response, Boyd did not complain to management about any sexual harassment, worked for three shifts following the harassment, and then failed to report for work without notice. Additionally, Crittenden and other people present at the time of the harassment testified at the criminal trial, denying the events alleged to have taken place, and Crittenden was found not guilty. Attached to the

response was a copy of Jimmy's Place's policy against sexual harassment, which the response stated was furnished to employees.

¶ 5        On June 1, 2007, a Commission investigator issued a report recommending a finding of "Substantial Evidence" of the charges and the Commission entered an order finding substantial evidence of a violation of the Cook County Human Rights Ordinance.

¶ 6        On July 9, 2008, the parties appeared before a hearing officer for a hearing on the complaint. Boyd was the sole witness testifying on her behalf. She testified that Jimmy's Place closed at 2 a.m., but "regulars" often remained and talked, which often included sexual conversations; Crittenden participated in the conversations. When asked to provide specifics as to inappropriate sexual activities that took place at Jimmy's Place, Boyd testified that "[t]he only evening that I can really specify is the evening that everything happened to me. The only thing that I can say is that I seen Rachel lap dancing one of the patrons."

¶ 7        Boyd testified that she had never seen a sexual harassment policy at Jimmy's Place and had never been provided with one. She further testified that Crittenden had made inappropriate comments to her, such as "you look good," "[w]hen can I get some," and "I've been looking at you, I've been wanting you." After such comments, Boyd told Crittenden that she was "not here for that" and that she was "not thinking about" him, and further testified that Crittenden's behavior "slowed down" after that, but did not stop.

¶ 8        Boyd testified that on the night of the alleged harassment, prior to closing, Rachel came behind the bar area and walked toward Boyd, with Crittenden following Rachel. As she was walking toward Boyd, Rachel called Boyd "fine" and "sexy." Rachel attempted to "grab" Boyd, but Boyd caught Rachel's arms and wrestled her to the floor. Crittenden was close enough that when Boyd wrestled Rachel to the floor, he straddled Rachel's back, "riding her like a pony." Boyd stepped back and Rachel stood up; Boyd told them to leave and Rachel and Crittenden left the bar area.

¶ 9        After Jimmy's Place closed at 2 a.m., Boyd was cleaning the bar while a number of people remaining engaged in activities such as dancing on tables and "humping." At approximately 2:10 a.m., Boyd took her tip jar and sat on the bar to begin counting her tips. Crittenden and Rachel were beside Boyd and she felt someone's hand tugging at her pants; Boyd did not know whether the person tugging her pants was Crittenden or Rachel. Boyd jumped up and told them to stop. Boyd then went behind the bar, where her manager was counting money in the cash register, and noticed that she had forgotten to retrieve napkins and straws from the storage area, located in the back of the establishment.

¶ 10       Boyd went to the storage area and obtained an armful of supplies. When she turned around, Boyd observed Rachel walking toward her from the direction of the building's back door. Boyd told Rachel to "[g]o on," but Rachel kept telling Boyd to "come on." Boyd again told Rachel to go ahead of her. Boyd then testified:

> "While I am going back and forth with her telling her to go ahead, Jimmy [Crittenden] comes in the backroom. And I am wrestling going back and forth with her. I didn't see Jimmy walking up. And the next thing you know, Jimmy walks up and takes her blouse and her bra and flips it up and says, 'Touch them, touch them. You know you want them, touch them.'

-3-

I've got my arm in between her breasts at this time, pushing them both back off of me, telling them get back off me. At this time I'm hollering for Lois, calling, 'Lois, Lois, come get them, come get them.'

And Lois finally came back there, and told them leave that girl alone. 'Lynita, come on, let's go.' They moved out of the way at that time. I went on about my business, put the stuff down, got my purse, and I left. So that's what happened there."

¶ 11    Boyd then went home, where she was "a nervous wreck" and talked to her husband about the incident the next day, which was a Thursday. On Friday, Boyd returned to work. Boyd testified that she returned "[b]ecause I needed my job, but I just didn't feel comfortable there anymore. I didn't feel safe there anymore when I went there." In response to questions from the hearing officer, Boyd testified that she went into work on the Friday after the incident and told Lois[1], the manager, that she was no longer comfortable there, did not feel safe, and that would be her last day. Boyd testified that she worked her entire shift on Friday before Lois arrived and that she told Lois that she did not feel comfortable speaking with Crittenden. Crittenden was not present while Boyd was working on Friday.

¶ 12    Boyd also testified that she was scheduled to work Saturday, but did not have a way of communicating with anyone at Jimmy's Place, so she went in and spoke to a maintenance person to obtain a phone number so that she could speak with somebody to tell them she was leaving. Boyd additionally testified that her family "came down there and supported [her]" and, in the process, her son "acted a fool" and "knocked some chairs down" because "[h]e was mad. He is young, teenage. *** But nothing happened to anybody."

¶ 13    Boyd testified that there was a criminal trial resulting from the incident and that there were witnesses to the events of the evening, but the State did not call any of them to testify on her behalf. On cross-examination, Boyd recalled testifying at the criminal trial that the events occurred on July 26, 2006. When defense counsel reminded her that the complaint in the instant case stated that the incident occurred on July 18 and 19, Boyd responded: "Well, yes, it must be my mistake, but I know the week before my husband's birthday. His birthday is August 4." Boyd acknowledged filing a sworn complaint stating that the incident occurred on July 19. Boyd's counsel interrupted to say that she would "be happy" to amend the complaint to change the date to the 26th and that "[w]e realized at some point subsequent the date was incorrect. We did not amend it but we will amend it."[2]

¶ 14    Defense counsel again questioned Boyd about filing a sworn complaint stating that the date of the incident was July 19. Boyd testified: "It was a week before my husband's birthday because it was his 50th birthday, and I was giving him a big 50th birthday party at Jimmy's Place. So it was a week before that." Boyd ultimately did not hold her husband's party at Jimmy's Place.

¶ 15    On redirect, Boyd testified that she was not consulting a calendar when she filled out the

---

[1]Boyd later testified that the workers referred to the manager as "Lois Lane," but that her actual name was Annie Grandberry.

[2]There is no indication that the complaint was ever amended.

complaint. She testified that "[t]he week before the 4th would have been the end of the month, that Wednesday. I don't know the correct date, but it had to be in the late 20s. Because the 4th was that Friday, next Friday or something like that. But I do know it was a week before my husband's 50th birthday." She testified that when she filed the complaint, she did not knowingly state any false information.

¶ 16    Boyd also testified to the effect the incident had on her. There were no bruises or other physical evidence of the incident, but her "nerves [were] shot," her "hair came out," and her psoriasis "flared up really bad." She testified that when she left Jimmy's Place, she did not have another job, but found new employment approximately a week and a half later as a bartender. When she stopped working at Jimmy's Place, she was making approximately $120 per week plus tips, which typically amounted to between $650 and $700.

¶ 17    On cross-examination, Boyd testified that she was paid in cash and did not have anything to substantiate her figures. She further admitted that she did not declare her tips on her income tax return that year.

¶ 18    Boyd testified that her new position was only one day per week, and she remained there for approximately a year and a half before she found a second job to supplement her income. Boyd left the one-day-a-week job in March 2008 and was still employed by the second employer at the time of the hearing. Boyd testified that her base income was approximately $400 to $500 a week, including tips.

¶ 19    The first witness to testify on behalf of the defense was Rachel Thomas. Thomas testified that she visited Jimmy's Place frequently and was present on the evening of July 26, 2006. Thomas denied any events occurring between midnight and 1:30 a.m. in which she had her blouse or bra pulled up, nor did she do so herself. Thomas also denied lap dancing with anyone and testified that Crittenden never pushed her into Boyd or told Boyd to touch Thomas's breasts. Thomas testified that she was a former employee of Jimmy's Place and last worked there in 2003 or 2004. She testified that she frequented Jimmy's Place "to have a good time. I know the people that work there. They know me. I used to work with them. They are like my family." On cross-examination, Thomas denied staying at Jimmy's Place past closing and testified that she only did so if she was waiting in the parking lot for a ride.

¶ 20    The defense's second witness was Rick Howard, a patron of Jimmy's Place who was present on the evening of July 26, 2006; Howard also occasionally worked at Jimmy's Place when he was asked to "help out." Howard testified that he left Jimmy's Place between 1:30 and 1:45 a.m. and did not observe any woman bare-breasted that evening, nor did he observe Crittenden push Thomas into Boyd. Howard testified that he was never shown a sexual harassment policy. Howard further testified that to his knowledge, everybody usually left prior to the 2 a.m. closing time.

¶ 21    The defense's third witness was Crittenden, who testified that he was present on July 26, 2006. Crittenden denied that Thomas was bare-breasted, denied pulling up her blouse or bra, and denied pushing Thomas into Boyd. Crittenden testified that Boyd did not work on Thursday, but worked a full shift on Friday and came in for a few hours on Saturday; she did not make any complaints to him about any incidents occurring on July 26, nor was Crittenden informed of her making any complaints to anyone else. Crittenden testified that he was not

present when Boyd worked on Friday, July 28. On Saturday, Crittenden received a telephone call at his home at approximately 2 p.m. saying that "Boyd's family was down there tearing my place up, throwing the chairs and different stuff. I know I heard her brother he want to kill me about something." When Crittenden arrived at Jimmy's Place, they were gone.

¶ 22    Crittenden testified that Jimmy's Place had a written sexual harassment policy and that he was "pretty sure they was [*sic*] out" for employees. Crittenden testified that Jimmy's Place closed at 2 a.m. during the week and that nobody was permitted to remain past that time; it was "a policy" that "[w]e have to be out of the bar at 2:00," including patrons and employees, and he was informed of that requirement by the police department. The bartenders began "breaking down" the bar at approximately 1:30, and "[a]t 2:00 my bartenders, my help, they be gone."

¶ 23    Crittenden testified that Boyd was a very good employee and came to work on time. Crittenden further testified that Boyd was paid $45 per day and generally worked three to four days a week. She received tips, but since she usually worked during the day, "lucky if you get $20 in tips" and not $650 to $700 per week. The typical amount of tips she could have expected on a weekday evening in July 2006 would have been approximately $70.

¶ 24    On February 27, 2009, the hearing officer issued a recommended decision, to which the parties had the opportunity to file written exceptions. The hearing officer recommended a finding of liability in favor of Boyd against Jimmy's Place. The recommended order included the following footnote:

> "The record includes much contradictory testimony as to whether the July 26, 2006 date is the accurate date. Complainant's original Complaint alleged July 19, 2006 as the relevant date. After reviewing the testimony within the record, the Hearing Officer concludes that the likeliest date is July 26, 2006 and that Complainant's failure to accurately recall that date at the time of filing of her Complaint is immaterial to the truth of her allegations."

The recommended order concluded that Boyd had proven by a preponderance of the evidence that she was sexually harassed during her employment in that she was subjected to a hostile work environment. It further concluded that Boyd had proven that the incidents of sexual harassment amounted to constructive discharge and that she was entitled to an award of compensatory damages, including back pay, attorney fees, and costs.

¶ 25    The order stated that the conduct complained of by Boyd was "certainly sufficient" to establish a hostile working environment "based upon any reasonable standard" and that "[s]he credibly testified to a history of sexually suggestive remarks directed toward her by Mr. Crittenden, culminating in the events of the evening of July 26, 2006, which by any measure were extreme in nature and sufficient to reach the 'sever[e] and pervasive' standard articulated by this Commission and the courts."

¶ 26    The hearing officer found the defense's witnesses "simply not credible." Thomas was a regular patron of Jimmy's Place and a former employee and stated that she was close to the people there. Howard was also a regular patron and occasional employee and had left prior to the time Boyd testified the incidents took place. Finally, concerning Crittenden, the hearing officer found:

"Throughout his testimony, Mr. Crittenden's demeanor was peculiar. He appeared extremely nervous and continually swiveled his chair sharply while he testified. In [a]ddition he proffered other testimony that Ms. Boyd credibly disputed, such as his inherently difficult-to-believe claim that the bar is vacant, under local law, by 2:00 a.m. each evening. Ms. Boyd testified that it was common for both employees and patrons to be inside the establishment past 2:00 a.m., and given her description of the many duties necessary to close the bar for the evening, it is simply not credible that the establishment is always vacant by 2:00 a.m."

¶ 27    The hearing officer found that there was no basis in the record to dispute Boyd's testimony. While she worked for an additional day, Crittenden was not present for that shift. "Further, both Ms. Boyd and Mr. Crittenden testified that when she returned the following day, along with her family, to announce her resignation, her son was exhibiting a great deal of anger and overturned some furniture. Had the sexual harassment of which Ms. Boyd complains not occurred at all–as Mr. Crittenden testified–there is no logical reason why Ms. Boyd would return to the bar with family members nor why an angry encounter would develop."

¶ 28    In determining that Crittenden's conduct constituted actionable harassment, the hearing officer noted: "Though this case deals almost exclusively with comments and behavior that occurred on one night, there was a demonstrated history of similar behavior over the course of Ms. Boyd's employment." Consequently, the hearing officer found that Boyd's allegation of constructive discharge and hostile work environment was sustained.

¶ 29    Concerning damages, the hearing officer compared the conduct with prior Commission cases and determined that a compensatory award of $5,000 was warranted, as was a punitive damages award of $5,000. With regard to lost wages, the hearing officer noted that the information in the record "renders a precise computation impossible." The hearing officer pointed out that Crittenden claimed that Boyd received a higher salary than she claimed, but that his estimate of her tips was much lower than hers. The hearing officer concluded: "Given that Ms. Boyd testified that the tips were paid in cash, the ambiguity must be resolved in her favor. It is Respondent which would most likely have some documentation of the tip income received by its wait staff, but Respondent failed to come forward with any such documentary evidence, relying solely upon Mr. Crittenden's incredible estimate of just $20 per day in tips." The hearing officer determined that Boyd had $86,240 in lost income. Subtracting her income earned in mitigation, the hearing officer determined that Boyd's awardable lost wages constituted $41,670.

¶ 30    Jimmy's Place filed its exceptions to the recommended order, arguing: (1) Boyd did not prove her sworn charge, (2) Boyd's credibility was destroyed as a matter of law and fact, (3) the recommended order relied upon inadmissible hearsay evidence and evidence that lacked a foundation, (4) there was insufficient evidence of damages, (5) the Commission did not authorize an award of punitive damages, and (6) there was no basis for an award of punitive damages.

¶ 31    On August 11, 2009, the hearing officer issued his final recommended order. The final recommended order incorporated the proposed recommended order and also addressed the

filed exceptions. The hearing officer reaffirmed that "[b]ecause this case presented radically conflicting facts, credibility determinations assumed particular importance" and that it was "essential" for the hearing officer to determine "who was being truthful and who was intentionally lying." The hearing officer again mentioned that Crittenden's demeanor while testifying during the hearing was "particularly striking":

"His answers were evasive and he continually figeted, nervously swiveled his chair, and clenched the chair's arm rests as he testified. He often appeared to be attempting to think of a suitable and non-incriminating answer before answering a question put to him. In addition, he offered some testimony that was so facially unlikely as to suggest that he was dissembling in an effort to cast doubt on Complainant's story, particularly in regard to his claim that the establishment was empty and closed by 2:00 a.m. sharp each day. As set out in the Proposed Recommended Order, it simply would not have been possible for the employees to perform the array of tasks described and to empty and close the establishment by 2:00 a.m., which rendered Complainant's testimony that it was common for employees and patrons to be present after 2:00 a.m. all the more credible."

¶ 32 The hearing officer also addressed the argument about Boyd's contradictory testimony about the date of the incident:

"Again, Complainant's credibility while explaining the inconsistency was high, inasmuch as they were a few days apart. While she may have gotten the date wrong at the time that Commission intake personnel prepared her Complaint, the difference between the two dates is simply not terribly significant. Were she inventing a totally false story of sexual harassment (which is essentially what Respondent is urging the Commission to find here), it is more likely that Complainant would have testified in accordance with the July 18 date set out in the Complaint. After all, if the entire story were false, why bother trying to explain why she had been mistaken about the exact date?"

¶ 33 Concerning the evidence of Boyd's family coming to the bar, the hearing officer first noted that the rules of evidence did not apply in matters before the Commission. However, even if they did, the hearing officer noted that the evidence was not hearsay evidence that was used to show that " 'Claimant's own flesh and blood believed Claimant's version' ":

"To the contrary, the fact that Complainant returned to the establishment with family members is significant because it corroborates Complainant's testimony that a significant event had occurred a few nights prior (a fact that Respondent disputes in its entirety). If no event of consequence occurred on the evening of July 26, why would Complainant return with angry relatives a day or so later? In no sense was the testimony proffered (nor regarded by the Hearing Officer) as proof of what Complainant's relatives had been told or believed had occurred. It was the act of returning to the establishment with relatives for the purpose of resigning her position that carries the significance and tends to corroborate Complainant's testimony that highly upsetting events had recently occurred which prompted the sudden resignation."

¶ 34 On February 16, 2010, the Commission entered its decision and order adopting the hearing officer's final recommended order and finding that Boyd proved a violation of the Cook County Human Rights Ordinance.

¶ 35    On January 21, 2011, Jimmy's Place and Crittenden filed a petition for a writ of *certiorari* with the circuit court of Cook County, requesting the court to reverse the final decision of the Commission and enter judgment on their behalf. On July 22, 2011, the circuit court entered an order denying the petition for writ of *certiorari* and affirming the Commission's decision as to liability and damages. This appeal follows.

¶ 36                                                ANALYSIS

¶ 37    On appeal, petitioners raise issues concerning the Commission's credibility determination, its purported use of hearsay evidence, and its determination as to damages. We consider each argument in turn.

¶ 38                                    I. Credibility Determination

¶ 39    In the case at bar, the hearing officer, whose opinion was adopted by the Commission, found Boyd's testimony credible. Petitioners argue: (1) the Commission's determination that Boyd was more credible than petitioners' witnesses was against the manifest weight of the evidence and (2) Boyd should not have been permitted to contradict her sworn allegations.

¶ 40    The decision of the Commission, which adopted the hearing officer's recommendations, is an administrative decision and judicial review is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2008)). 325 ILCS 5/7.16 (West 2008). While the instant appeal arises from petitioners' petition for a writ of *certiorari*, "[t]he standards of review under a common law writ of *certiorari* are essentially the same as those under the Administrative Review Law." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996) (citing *Smith v. Department of Public Aid*, 67 Ill. 2d 529, 541-42 (1977)). In the case of an administrative review action, we review the findings of the hearing officer during the administrative hearing and not the decision of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006) (*per curiam*). In reviewing the actions of an administrative agency, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2008). The reviewing court is not to reweigh the evidence or make an independent determination of the facts. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 463 (2009).

¶ 41    The propriety of the agency's findings of fact will be upheld unless they are against the manifest weight of the evidence. *Kouzoukas*, 234 Ill. 2d at 463; *Marconi*, 225 Ill. 2d at 532. "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The fact that the opposite conclusion is reasonable or that the reviewing court may have reached a different outcome does not justify reversal of the administrative findings. *Abrahamson*, 153 Ill. 2d at 88. "If the record contains evidence to support the agency's decision, it should be affirmed." *Abrahamson*, 153 Ill. 2d at 88-89.

¶ 42    In the case at bar, petitioners argue that the Commission's decision was against the manifest weight of the evidence. Specifically, petitioners argue that the Commission erred in finding credible evidence to support the sexual harassment charge "based on perjury of an

individual, criminal violations of that individual, and uncorroborated testimony, in the face of witnesses who did not commit perjury, did not admit criminal violations and had nothing to gain." Petitioners claim that Boyd's testimony was wholly incredible since (1) she contradicted the allegations of her complaint twice, (2) she testified that she did not report her tip income on her income taxes, and (3) her testimony was uncorroborated. In contrast, petitioners argue that their witnesses were more credible in part because they did none of the above. We find petitioners' argument unpersuasive.

¶ 43      In essence, petitioners are asking us to reweigh the evidence and determine that their witnesses were more credible than Boyd. As noted, we are not permitted to reweigh the evidence or make credibility determinations (*Kouzoukas*, 234 Ill. 2d at 463), and we will affirm an agency's decision if there is evidence in the record to support it (*Abrahamson*, 153 Ill. 2d at 88-89). In the case at bar, there is evidence in the record to support the hearing officer's determinations. The hearing officer made it clear, in both his proposed recommended order and in his final recommended order, that "[b]ecause this case presented radically conflicting facts, credibility determinations assumed particular importance" and that it was "essential" for the hearing officer to determine "who was being truthful and who was intentionally lying." The hearing officer also stated that he found Boyd's testimony credible and specifically explained why he did not find petitioners' witnesses credible. For instance, in his final recommended order, the hearing officer noted that Thomas was a regular patron of Jimmy's Place and a former employee who stated that she was close to the people there; Howard was also a regular patron and occasional employee who had left prior to the time Boyd testified the incidents took place. Finally, concerning Crittenden, the hearing officer found:

>      "Throughout his testimony, Mr. Crittenden's demeanor was peculiar. He appeared extremely nervous and continually swiveled his chair sharply while he testified. In [a]ddition he proffered other testimony that Ms. Boyd credibly disputed, such as his inherently difficult-to-believe claim that the bar is vacant, under local law, by 2:00 a.m. each evening. Ms. Boyd testified that it was common for both employees and patrons to be inside the establishment past 2:00 a.m., and given her description of the many duties necessary to close the bar for the evening, it is simply not credible that the establishment is always vacant by 2:00 a.m."

Additionally, all of petitioners' arguments before us were also made before the hearing officer, and consequently, we cannot find that his decision to believe Boyd over the other witnesses was against the manifest weight of the evidence. See *People v. Strickland*, 154 Ill. 2d 489, 521 (1992) (noting that the same argument concerning a defense theory had been presented and specifically rejected by the trial court and upholding the trial court's factual finding); *Fuery v. Rego Co.*, 71 Ill. App. 3d 739, 745-46 (1979) ("It cannot be forgotten that the trial judge here also considered these same arguments *** and rejected them after careful consideration.").

¶ 44      We are also unpersuaded by petitioners' arguments concerning Boyd's contradiction in her complaint. Petitioners claim that Boyd was permitted to contradict her sworn allegations twice: once when she testified that the incident occurred on July 26, 2006, not July 19, and again when she testified that she returned to work on Friday and Saturday despite alleging

that she never returned to Jimmy's Place. Petitioners argue that Boyd's allegations were judicial admissions and she should not have been permitted to contradict them; thus, they claim, Boyd did not prove the allegations in her complaint and should have been denied relief. We find petitioners' argument unpersuasive.

¶ 45 Judicial admissions " 'are formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' " *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 557-58 (2005) (quoting John Williams Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992)); see also *Lawlor v. North American Corp. of Illinois*, 409 Ill. App. 3d 149, 163 (2011). They are defined as "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998) (citing *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 480 (1987)). A verified pleading remains part of the record despite any amendments to the pleadings "and any admissions not the product of mistake or inadvertence become binding judicial admissions." *Rynn v. Owens*, 181 Ill. App. 3d 232, 235 (1989) (citing *American National Bank & Trust Co. of Chicago v. Erickson*, 115 Ill. App. 3d 1026, 1029 (1983)). "A party cannot create a factual dispute by contradicting a previously made judicial admission." *Burns v. Michelotti*, 237 Ill. App. 3d 923, 932 (1992). However, " '[t]he doctrine of judicial admissions requires thoughtful study for its application so that justice not be done on the strength of a chance statement made by a nervous party.' " *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468 (2009) (quoting *Thomas v. Northington*, 134 Ill. App. 3d 141, 147 (1985)).

¶ 46 Although neither party discusses it, we must first consider the standard of review that applies to our review of the Commission's decision to accept Boyd's testimony instead of limiting her to the allegations in her complaint. There are two lines of cases concerning the proper standard of review. The first, established in 1987 by *Hansen*, 155 Ill. App. 3d at 480, considers the issue as a question of law subject to *de novo* review. See, *e.g.*, *Choate v. Indiana Harbor Belt R.R. Co.*, 2011 IL App (1st) 100209, ¶ 86; *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360 (2009); *Elliott v. Industrial Comm'n*, 303 Ill. App. 3d 185, 187 (1999). *De novo* consideration means the reviewing court performs the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). The *de novo* standard of review derives from the requirement that a judicial admission be a "deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge" and is based on the determination that the question of whether the statement is equivocal is one of law and not fact. *Hansen*, 155 Ill. App. 3d at 480.

¶ 47 The second, beginning in 1988 with *Lowe v. Kang*, 167 Ill. App. 3d 772, 777 (1988), applies an abuse of discretion standard of review. See, *e.g.*, *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011); *Smith*, 394 Ill. App. 3d at 468; *Dremco, Inc. v. Hartz Construction Co.*, 261 Ill. App. 3d 531, 536 (1994). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 801 (2002) (citing *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 865 (1998)). The abuse of discretion standard focuses on the context of the purported admission: "What constitutes a judicial admission must be decided under the circumstances in each case, and

-11-

before a statement can be held to be such an admission, it must be given a meaning consistent with the context in which it was found. [Citation.] It must also be considered in relation to the other testimony and evidence presented." *Serrano*, 406 Ill. App. 3d at 907 (citing *Smith*, 394 Ill. App. 3d at 468).

¶ 48        We note that both the cases advocating for *de novo* review and the cases applying the abuse of discretion standard of review agree on the same basic framework to be applied in determining whether a statement is deemed a judicial admission. Thus, a case applying the abuse of discretion standard still requires the statement to be "clear, unequivocal, and uniquely within the party's personal knowledge" (*Serrano*, 406 Ill. App. 3d at 907 (citing *Williams Nationalease, Ltd. v. Motter*, 271 Ill. App. 3d 594, 597 (1995))), and a case applying *de novo* review also looks at the context of the statement. See *Herman*, 388 Ill. App. 3d at 361 (noting that the doctrine should not be applied to an attorney's statement of legal opinion in a summary judgment proceeding, "especially if the opinion was manifestly incorrect within the context of the statement itself"). In the case at bar, regardless of the standard of review applied, we cannot find that the Commission erred in permitting Boyd to clarify and explain the allegations in her complaint.

¶ 49        As noted, a verified pleading remains part of the record despite any amendments to the pleadings "and any admissions not the product of mistake or inadvertence become binding judicial admissions." *Rynn*, 181 Ill. App. 3d at 235 (citing *Erickson*, 115 Ill. App. 3d at 1029). Here, however, Boyd testified that she made a mistake by alleging that the sexual harassment occurred on July 19, 2006, instead of July 26, and the hearing officer and the Commission accepted the explanation that the incident occurred on July 26. Boyd testified that she did not consult a calendar before filling out the complaint form with the Commission and further testified that she knew the date during the hearing due to its proximity to her husband's fiftieth birthday. Her attorney also commented that they discovered the mistaken date at some point after the complaint had been filed; based on the record, it appears that counsel was not present when Boyd completed the complaint form, with the hearing officer's final recommended order indicating that the complaint would have been prepared by "Commission intake personnel." Finally, Boyd testified that she did not knowingly make any false allegations in her complaint. Given Boyd's explanation, the difference of only seven days between the two dates, and the insignificance of the exact date of the incident to the overall cause of action, we cannot find that the Commission erred in permitting Boyd to testify that the incident occurred on July 26 and not July 19, nor can we find error in the Commission permitting Boyd to testify that she worked one additional shift two days after the incident when Crittenden was not present.

¶ 50        We find petitioners' authority to the contrary to be inapposite. In *O'Neill v. Chicago Transit Authority*, 5 Ill. App. 3d 69 (1972), the issue was whether the plaintiff should have been permitted to completely contradict the material facts of his complaint after the close of the evidence at trial. The original complaint alleged, and the plaintiff testified, that he was attempting to board a bus when the driver placed the bus in motion before the plaintiff had completely boarded; the plaintiff testified that he drank two beers that night. *O'Neill*, 5 Ill. App. 3d at 71. After the close of evidence, where the defendant's witnesses testified that the plaintiff appeared intoxicated, the plaintiff amended his complaint to allege that he was

-12-

intoxicated, entered the bus, and fell out the open door, and that the driver knew of the plaintiff's condition and failed to take precaution to protect him from injury while on the bus. *O'Neill*, 5 Ill. App. 3d at 72. The appellate court found that the trial court erred in permitting the plaintiff to amend his complaint, noting that "[p]laintiff cannot abandon his own sworn evidence and then attempt to recover by adopting completely inconsistent evidence produced by other witnesses." *O'Neill*, 5 Ill. App. 3d at 72. Here, Boyd's evidence was more of a clarification than an inconsistency.

¶ 51 Petitioners also cited to *Burdin v. Jefferson Trust & Savings Bank of Peoria*, 133 Ill. App. 2d 703 (1971), in which the appellate court found that the plaintiff's amended complaint failed to state a cause of action when he amended his complaint from alleging a breach of lease to alleging a breach of a partnership agreement. The appellate court noted that the plaintiff would be bound by the initial verified complaint unless the amended complaint disclosed that the admissions were made through mistake or inadvertence. *Burdin*, 133 Ill. App. 2d at 708. The court found that "[b]y no stretch of the imagination can we conclude that the allegations in the original complaint and first amended complaint were made under a misapprehension or mistake," finding that the plaintiff "most certainly would have known whether he was operating under a lease agreement or a partnership agreement." *Burdin*, 133 Ill. App. 2d at 708. See also *Beverly Bank v. Coleman Air Transport*, 134 Ill. App. 3d 699, 704 (1985) (finding that there was nothing supporting the plaintiff's conclusory statements that his attorney did not consult with him prior to filing an answer, especially where the plaintiff had asserted the attorney-client privilege in the trial court and had prevented disclosure of the circumstances surrounding the verification of the original answer). In the case at bar, Boyd's complaint was based on mistake or inadvertence.

¶ 52 Unlike in *O'Neill*, Boyd did not shift the entire basis for her cause of action; she simply stated the wrong date and testified that she worked one additional shift when Crittenden was not present. The events otherwise alleged in the complaint were consistent with her testimony at trial. Likewise, the plaintiff in *O'Neill* did not argue that the inconsistent positions were the result of mistake or inadvertence. See also *Dark v. United States Fidelity & Guaranty Co.*, 175 Ill. App. 3d 26, 32-33 (1988) (rejecting the plaintiff's arguments that he should not be bound by the damage amount stated in verified pleadings when there was no mention of mistake or inadvertence). Thus, we do not find *O'Neill* persuasive. Similarly, unlike in *Burdin*, here, the mistakes made by Boyd were not of such magnitude that she "most certainly would have known" of them at the time of filing her complaint. See *Burdin*, 133 Ill. App. 2d at 708. As noted, Boyd testified that she did not have a calendar and the record suggests that she filled out the complaint form without the assistance of an attorney and without any specialized knowledge.

¶ 53 Petitioners argue that Boyd was required to "shift her sworn facts as to the date (and whether she returned to work thereafter)" because she had testified at the criminal trial that the date was July 26 and otherwise would be subject to impeachment. There is absolutely no evidence in the record of any bad faith on Boyd's part in her testimony during the hearing. Moreover, if there was any such evidence, it would be the hearing officer, who had the opportunity to observe Boyd's demeanor, who would be in the best position to determine Boyd's motivations. Accordingly, we cannot find that the Commission erred in permitting

-13-

Boyd to contradict her allegations at the hearing.

¶ 54    Petitioners also briefly argue in the damages portion of their brief that Boyd mentioned only one date in which any harassment occurred and that there was consequently no foundation to determine that a history of sexual harassment had occurred. The hearing officer found that the conduct complained of by Boyd was "certainly sufficient" to establish a hostile working environment "based upon any reasonable standard" and that "[s]he credibly testified to a history of sexually suggestive remarks directed toward her by Mr. Crittenden, culminating in the events of the evening of July 26, 2006, which by any measure were extreme in nature and sufficient to reach the 'sever[e] and pervasive' standard articulated by this Commission and the courts." It is clear from the record that the hearing officer accepted Boyd's testimony of prior comments made by Crittenden, as well as her testimony concerning the events of July 26. Petitioners do not argue that the incident on July 26 was insufficient to establish harassment but only that the history of prior incidents was unfounded and insufficient to demonstrate harassment. Again, we are not permitted to reweigh the evidence (*Kouzoukas*, 234 Ill. 2d at 463), and we will affirm an agency's decision if there is evidence in the record to support it (*Abrahamson*, 153 Ill. 2d at 88-89).

¶ 55    For sexual harassment to be actionable, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). A court must examine all of the circumstances before determining whether an environment is hostile or abusive, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). While all of the relevant factors may be taken into account, "no single factor is required." *Harris*, 510 U.S. at 23.

¶ 56    In the case at bar, as noted, petitioners do not argue that the conduct of July 26, 2006, was insufficient to constitute sexual harassment but only focus on Boyd's claims that Crittenden had made comments to her previously. The hearing officer determined that Boyd's testimony was credible, and there is nothing in the record to demonstrate that the hearing officer's determination was against the manifest weight of the evidence. Moreover, a history of harassing comments is not necessarily required; the events of July 26 were sufficient in themselves to demonstrate actionable harassment. See *Harris*, 510 U.S. at 23 ("no single factor is required"). Accordingly, we are not persuaded by petitioners' arguments concerning the history of any harassment.

¶ 57                                                    II. Hearsay

¶ 58    Petitioners also claim that the hearing officer improperly relied on hearsay evidence in finding in Boyd's favor. Petitioners point to the following statement made by the hearing officer: "Further, both Ms. Boyd and Mr. Crittenden testified that when she returned the following day, along with her family, to announce her resignation, her son was exhibiting a great deal of anger and overturned some furniture. Had the sexual harassment of which Ms.

Boyd complains not occurred at all–as Mr. Crittenden testified–there is no logical reason why Ms. Boyd would return to the bar with family members nor why an angry encounter would develop." Petitioners argue that the hearing officer's reliance on the actions of the family members constitutes reversible error. We do not find petitioners' argument persuasive.

¶ 59    An administrative agency's decision concerning the introduction of evidence " 'is properly governed by an abuse of discretion standard and subject to reversal only if there is demonstrable prejudice to the party.' " *Three Angels Broadcasting Network, Inc. v. Department of Revenue*, 381 Ill. App. 3d 679, 699 (2008) (quoting *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003)). "An abuse of discretion occurs when no reasonable person would take the view adopted by the court." *Trettenero*, 333 Ill. App. 3d at 801 (citing *Blunda*, 299 Ill. App. 3d at 865). In the case at bar, the hearing officer's reliance on the conduct of Boyd's family did not constitute reversible error.

¶ 60    First, petitioners are the ones who first brought forth the fact that Boyd's family visited Jimmy's Place on the Saturday following the incident. Crittenden testified that on Saturday, he received a telephone call at his home at approximately 2 p.m. saying that "Boyd's family was down there tearing my place up, throwing the chairs and different stuff. I know I heard her brother he want to kill me about something." When Crittenden arrived at Jimmy's Place, they were gone. After Crittenden's testimony, Boyd was recalled to testify concerning damages and also confirmed that her family had been at Jimmy's Place on Saturday and her son "acted a fool" and "knocked some chairs down."

¶ 61    The Illinois Supreme Court has held that, under " 'the doctrine of invited error,' " a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Carter*, 208 Ill. 2d 309, 319 (2003)). To permit a party to use, as a vehicle for reversal, the exact action which it procured in the trial court " 'would offend all notions of fair play' " and encourage duplicity by litigants. *Harvey*, 211 Ill. 2d at 385 (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Thus, when a party "procures, invites or acquiesces" to a trial court's evidentiary ruling, even if the ruling is improper, he cannot contest the ruling on appeal. *People v. Bush*, 214 Ill. 2d 318, 332 (2005); *Harvey*, 211 Ill. 2d at 386; *People v. Caffey*, 205 Ill. 2d 52, 114 (2001). The hearing officer made it clear that he was relying on Crittenden's testimony concerning the incident as well as Boyd's. After introducing the evidence through Crittenden's testimony, petitioners cannot now complain that the hearing officer should have refused to consider it.

¶ 62    Even if the issue was considered on its merits, the Commission's procedural rules provide that the hearing officer is not bound by the rules of evidence. Section 460.105 of the procedural rules provides:

> "The Hearing Officer shall have full authority to control the procedures of the Administrative Hearing, to question any party regarding the Complaint at issue, to rule upon all motions and objections, and to admit or exclude testimony or other evidence. The Hearing Officer shall not be bound by the strict rules of evidence applicable in courts of law or equity." Cook County Comm'n on Human Rights Procedural Rules § 460.105 (eff. Mar. 20, 2007).

Accordingly, the hearing officer was permitted to consider evidence that would not normally be admissible in a civil proceeding. See also *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 52 (2000) (noting that evidence not admissible under the rules of evidence may be admitted in an administrative proceeding "if the evidence is of a type commonly relied upon by reasonable, prudent men and women in the conduct of their affairs").

¶ 63    Additionally, even if the hearing officer was bound by the strict rules of evidence, any error in using the family's conduct would be harmless. Hearsay evidence consists of "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). This type of evidence " 'is generally inadmissible due to its lack of reliability' " and the inability of the opposing party to confront the declarant unless it falls within an exception to the hearsay rule. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001) (quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)). See also *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009). Nonverbal conduct may be a "statement" for the purposes of the hearsay rule. See Ill. R. Evid. 801(a) (eff. Jan. 1, 2011) (a statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion" offered to prove the truth of the matter); *People v. Higgs*, 11 Ill. App. 3d 1032, 1037 (1973) (noting that assertive conduct may be inadmissible hearsay).

¶ 64    Here, the conduct of the family in coming to Jimmy's Place and "tearing [the] place up" can be considered as a statement and was used by the hearing officer to corroborate Boyd's testimony, indicating that it was used as proof that an incident occurred at Jimmy's Place. Consequently, it would be hearsay and should have been excluded by the hearing officer. We are not persuaded by Boyd's arguments that the statement was an admission by a party or satisfied the excited utterance or present sense impression exceptions to the hearsay rule. Boyd's arguments fail to identify the proper "statement"–it is not Crittenden's testimony or his conversation with his employee that is the statement, but the conduct of Boyd's family. Thus, we do not find any of these exceptions applicable.

¶ 65    However, any error in considering the conduct of Boyd's family is harmless. The hearing officer explained in detail why each of petitioners' witnesses was not credible. He also discussed why Boyd's testimony was credible. While the conduct of her family served to corroborate Boyd's testimony, the hearing officer did not solely rely on that to find Boyd credible. Instead, the hearing officer stated that Boyd testified credibly, presented her testimony "with conviction," and provided "reasonably detailed [testimony] as to the events that occurred and their sequence." He also noted that Crittenden's testimony that Jimmy's Place was empty by 2 a.m. was incredible and served to make Boyd's testimony that it was common for patrons and employees to be present after 2 a.m. "all the more credible." Thus, there was sufficient evidence to support the hearing officer's decision. Accordingly, even if the hearing officer should not have considered the conduct of Boyd's family, any error was harmless and does not constitute reversible error. See *Abrahamson*, 153 Ill. 2d at 94 (" '[W]here there is sufficient competent evidence to support an administrative decision, the improper admission of hearsay testimony in the administrative proceeding is not prejudicial error.' " (quoting *Goranson v. Department of Registration & Education*, 92 Ill. App. 3d 496, 501 (1980))); *Discovery South Group, Ltd. v. Illinois Pollution Control Board*, 275 Ill. App.

3d 547, 554 (1995) (finding that reversal was not required even if documents had been inadmissible hearsay since "sufficient competent evidence was presented and relied upon by the Board in reaching its determination").

¶ 66                                    III. Damages

¶ 67    Finally, petitioners claim that the Commission erred in its damages calculation. They argue that the Commission committed reversible error in determining that there were damages despite Boyd's failure to prove her losses and also argue that the Commission erred in awarding punitive damages.

¶ 68                              A. Compensatory Damages

¶ 69    Petitioners first argue that there was insufficient evidence of actual losses or mitigation and, accordingly, the Commission erred in awarding her over $40,000 in compensatory damages. Under the Ordinance, relief for a violation of the Ordinance may include "actual damages, as reasonably determined by the Commission, for injury or loss suffered." Cook County Code of Ordinances § 42-34(c)(1)(b) (amended Nov. 19, 2002). In the case at bar, the hearing officer recommended an award of $41,670 for Boyd's lost wages, and the Commissioner adopted the recommendation. However, petitioners claim that Boyd provided "no evidence" as to her lost wages. While Boyd did not provide documentary evidence of her wages while employed at Jimmy's Place, Boyd did testify at the hearing concerning her wages, as did Crittenden. The hearing officer accepted Boyd's testimony as more credible and, as noted previously, that decision was not against the manifest weight of the evidence. Thus, we cannot find that Boyd failed to provide evidence of her lost wages.

¶ 70    Petitioners further argue that Boyd failed to prove that she mitigated her damages. Boyd was required to exercise reasonable diligence in mitigating her damages. See *Heeren Co. v. Human Rights Comm'n*, 150 Ill. App. 3d 234, 241-42 (1986). However, it was petitioners who had the burden of proving that Boyd failed to reasonably mitigate her damages. See *People ex rel. Bourne v. Johnson*, 32 Ill. 2d 324, 329 (1965) ("The defendants were here the wrongdoers, and the obligation to produce whatever proof existed in diminution of damages rested on them. The overwhelming weight of authority *** is that an employer in an action for lost wages[ ] must affirmatively show in order to reduce damages that the discharged employee could or did have other earnings subsequent to the wrongful discharge."); *Board of Education of the City of Chicago v. Weed*, 281 Ill. App. 3d 1010, 1017 (1996) (noting that when a teacher is wrongfully discharged, "[t]he employer has the burden of showing that the teacher could have made additional earnings"); *Raintree Health Care Center v. Human Rights Comm'n*, 275 Ill. App. 3d 387, 396 (1995) (rejecting the defendant's argument that the plaintiff had failed to mitigate his damages since the ALJ found the plaintiff's testimony credible and the defendants did not present any evidence of other appropriate jobs for which the plaintiff was qualified). Here, petitioners did not present any evidence that Boyd failed to mitigate her damages. Additionally, Boyd testified that she was employed at a one-day-a-week job a week and a half after terminating her employment at Jimmy's Place and found a second job a year and a half later. Thus, we cannot find that Boyd failed to mitigate her

damages and affirm the Commission's award of compensatory damages. See *Board of Directors, Green Hills Country Club v. Human Rights Comm'n*, 162 Ill. App. 3d 216, 221 (1987) (finding damages mitigated where the complainants "were employed for various periods after quitting Green Hills, that they sent out resumes and generally endeavored to remain employed" and there was no evidence presented to contradict the complainants' claims).

¶ 71                                B. Punitive Damages

¶ 72    However, we find that the Commission did not have the authority to award punitive damages. Both parties acknowledge that the Ordinance does not expressly speak to the imposition of punitive damages. Petitioners argue that since punitive damages are not expressly permitted by the Ordinance, they are prohibited, while Boyd claims that the Ordinance should be read to permit the imposition of punitive damages. We agree with petitioners and do not find Boyd's arguments to the contrary persuasive.

¶ 73                    1. Availability of Punitive Damages Generally

¶ 74    "Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). These purposes make the function of punitive damages similar to that of a criminal penalty. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 187-88 (1978). "Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay*, 74 Ill. 2d at 188. Whether punitive damages are available for a particular cause of action is a question of law. *Knierim v. Izzo*, 22 Ill. 2d 73, 87 (1961). As such, we review it *de novo*. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1137-38 (2004) (noting that whether the finder of fact is the trial court or a jury, the determination of whether punitive damages are available for the cause of action is a question of law reviewed *de novo*). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578.

¶ 75    In a cause of action based on a statutory violation, punitive damages may be awarded either because the statute expressly permits them or because the facts of the case allow the imposition of common law punitive damages. A statute may expressly permit punitive damages or may expressly prohibit them. See, *e.g.*, *Bernier v. Burris*, 113 Ill. 2d 219, 245 (1986) (noting that a variety of statutes prohibiting punitive damages have been upheld by the supreme court and citing cases); *Linhart v. Bridgeview Creek Development, Inc.*, 391 Ill. App. 3d 630, 641 (2009) (noting that the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2006)) explicitly allows for the recovery of punitive damages where the conduct of the defendant was willful or intentional and done with evil motive or reckless indifference to the rights of others). Those statutes that expressly permit punitive damages often do so by incorporating the requirements of common law punitive damages. See, *e.g.*, *Linhart*, 391 Ill. App. 3d at 641.

¶ 76    If the statute does not expressly discuss punitive damages, then common law punitive

-18-

damages may be available if warranted by the facts of the case. See, *e.g.*, *Vincent v. Alden-Park Strathmoor, Inc.*, 241 Ill. 2d 495, 502 (2011) (noting that although not expressly mentioned in the Nursing Home Care Act (210 ILCS 45/2-101 *et seq.* (West 2006)), plaintiffs may recover common law punitive damages upon proof of willful and wanton misconduct on the part of the defendant). Due to the penal nature of punitive damages, a court may only award them for torts that are "committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay*, 74 Ill. 2d at 186 (citing *Consolidation Coal Co. of St. Louis v. Haenni*, 146 Ill. 614, 628 (1893)). " '[P]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.' " *Loitz*, 138 Ill. 2d at 415 (quoting Restatement (Second) of Torts § 908, cmt. b (1979)).

¶ 77                              2. Authority of Administrative Agency

¶ 78        In the case at bar, the question of whether punitive damages are authorized is also impacted by the status of the Commission as an administrative agency. An administrative agency is limited to the powers granted to it by the legislature, and any actions it takes must be authorized by statute. *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 186 (2003). An agency "has no general or common law authority." *Vuagniaux*, 208 Ill. 2d at 186. "Any power or authority claimed by an administrative agency must find its source within the provisions of the statute by which the agency was created. The agency's authority must either arise from the express language of the statute or 'devolve by fair implication and intendment from the express provisions of the [statute] as an incident to achieving the objectives for which the [agency] was created.' " *Vuagniaux*, 208 Ill. 2d at 187-88 (quoting *Schalz v. McHenry County Sheriff's Department Merit Comm'n*, 113 Ill. 2d 198, 202-03 (1986)). "The issue of an administrative body's authority presents a question of law and not a question of fact. The determination of the scope of the agency's power and authority is a judicial function and is not a question to be finally determined by the agency itself." *County of Knox ex rel. Masterson v. The Highlands, L.L.C.*, 188 Ill. 2d 546, 554 (1999).

¶ 79                              3. Punitive Damages Under the Ordinance

¶ 80        The Ordinance outlines the various relief measures available to the Commission for violations of the Ordinance. Section 42-34(c)(1) provides:

> "Relief may include, but is not limited to, an order to:
>
>> a. Cease the illegal conduct complained of and to take steps to alleviate the effect of the illegal conduct complained of[.]" Cook County Code of Ordinances § 42-34(c)(1) (amended Nov. 19, 2002).

The Ordinance also instructs that "[t]he provisions of this article shall be liberally construed for the accomplishment of its purpose." Cook County Code of Ordinances § 42-32 (amended Nov. 19, 2002).

¶ 81        As noted, the Ordinance does not expressly authorize the imposition of punitive damages,

-19-

and Boyd does not argue that it does. By contrast, the Ordinance does expressly authorize compensatory damages. See, *e.g.*, Cook County Code of Ordinances § 42-34(c)(1)(b), (c)(1)(h) (amended Nov. 19, 2002). Accordingly, in order for the Commission to have the authority to impose punitive damages, the authority must be found, by fair implication and intendment, to be incident to the express authority conferred by the legislature. See *Schalz*, 113 Ill. 2d at 202-03. Municipal ordinances are interpreted using the same rules of statutory interpretation as statutes, and are reviewed *de novo*. *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 850 (2007). Again, *de novo* consideration means we perform the same analysis that a trial judge would perform. *Khan*, 408 Ill. App. 3d at 578. "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 45 (2002). The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Birkett*, 202 Ill. 2d at 45. Since all provisions of a statutory enactment are viewed as a whole, words and phrases should not be construed in isolation, but should be interpreted in light of other relevant provisions of the statute. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Lieberman*, 201 Ill. 2d at 308 (citing *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001), and *A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 532 (1999)). However, "[i]t is a cardinal rule of statutory construction that we cannot rewrite a statute, and depart from its plain language, by reading into it exceptions, limitations or conditions not expressed by the legislature." *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 81 (2009) (citing *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004)).

¶ 82    In the case at bar, Boyd argues that the Commission is authorized to impose punitive damages because: (1) the list of available remedies is nonexhaustive, (2) the Ordinance is meant to be liberally construed, (3) the Commission has itself determined that it has the authority to impose punitive damages, (4) the appellate court has found punitive damages available under an analogous statute, and (5) the conduct in the case at bar was sufficiently egregious to permit the imposition of punitive damages. We find Boyd's arguments unpersuasive and find that punitive damages are not permitted under the Ordinance.

¶ 83    The Ordinance does provide that relief under the Ordinance:

"may include, *but is not limited to*, an order to:

a. Cease the illegal conduct complained of and to take steps to alleviate the effect of the illegal conduct complained of[.]" (Emphasis added.) Cook County Code of Ordinances § 42-34(c)(1) (amended Nov. 19, 2002).

As such, the list of available remedies is not meant to be exhaustive, especially in light of the Ordinance's instruction that "[t]he provisions of this article shall be liberally construed for the accomplishment of its purpose." Cook County Code of Ordinances § 42-32 (amended Nov. 19, 2002). However, this does not mean that the Commission has the authority to order any type of relief it deems desirable.

¶ 84    "[P]unitive damages are fundamentally unlike any other measure of civil damages." *Franz*, 352 Ill. App. 3d at 1140. A punitive damages award "is not directed at compensating a plaintiff's injury but is directed at punishing a defendant's actions." *Harriss v. Elliott*, 207

-20-

Ill. App. 3d 384, 390 (1991). Indeed, "[p]unitive damages actually improve the position of the complaining party, while all other damages simply return the plaintiff to the position he held before the wrong." *Franz*, 352 Ill. App. 3d at 1140. Thus, while in awarding compensatory damages, the focus is on the plaintiff's losses, the focus in determining the availability and amount of punitive damages is on the character of the defendant's conduct. *Winters v. Greeley*, 189 Ill. App. 3d 590, 599 (1989). Because of their penal nature, courts must take caution in imposing punitive damages. See *Kelsay*, 74 Ill. 2d at 188. "[P]unitive damages are never awarded as a matter of right. *** [N]o matter how egregious the defendant's conduct may be, the jury is never obliged to assess punitive damages." *Winters*, 189 Ill. App. 3d at 599 (citing *Smith v. Wade*, 461 U.S. 30, 52 (1983)). Examining the other types of relief provided by the Ordinance, it is apparent that they are compensatory (see, *e.g.*, Cook County Code of Ordinances § 42-34(c)(1)(b), (c)(1)(h) (amended Nov. 19, 2002)), require actions such as posting notices (see Cook County Code of Ordinances § 42-34(c)(1)(j) (amended Nov. 19, 2002)), or impose a fine for violations (see Cook County Code of Ordinances § 42-34(c)(1)(k) (amended Nov. 19, 2002)). None of these types of relief indicate that the Commission is entitled to improve the complainant's position while punishing the violator. Indeed, the provision permitting the imposition of a fine demonstrates that the Commission could have required the payment of a monetary penalty if it had chosen to do so.

¶ 85        Moreover, there are certain situations in which a legislature has expressly permitted an administrative agency to award punitive damages, including ordinances enacted by Cook County. See, *e.g.*, 415 ILCS 5/22.2(k) (West 2010) ("If any person who is liable for a release or substantial threat of release of a hazardous substance or pesticide fails without sufficient cause to provide removal or remedial action ***, such person may be liable to the State for punitive damages ***. The punitive damages imposed by the [Pollution Control] Board shall be in addition to any costs recovered from such person pursuant to this Section ***."); 820 ILCS 255/17(e) (West 2010) ("The Director of the [Illinois Department of Labor] is authorized to assess punitive damages against any employer, manufacturer, importer, supplier or other person, who knowingly and willfully violates any of the provisions of this Act ***."); Burnham Code of Ordinances § 46-63(1) (adopted Jan. 28, 1997) ("[T]he fair housing review board may *** [d]irect[ ] the respondent to pay compensatory/actual damages ***, punitive damages, attorney fees and costs."); Cook County Code of Ordinances § 34-128(h) (adopted July 10, 2007) ("Any underpayment that has not been repaid to a worker within 30 days of violation is subject to an additional two percent of the underpayment as a punitive damage assessment payable to the worker."). The presence of such statutes and ordinances demonstrates that legislatures at all levels of government have expressly given this power to agencies when they choose to, and counsels against finding the authority to impose punitive damages in the absence of that express authority. See *Abatron, Inc. v. Department of Labor*, 162 Ill. App. 3d 697, 701 (1987) ("Had the legislature intended that the Department of Labor or its Director have the authority asserted in this case, the legislature could have easily so provided but did not do so."). Additionally, other than one case that is discussed below, neither party has presented, and we have been unable to discover, any cases in which an administrative agency's statute or ordinance is found to

implicitly permit the imposition of punitive damages, nor is there any case in which the agency is permitted to award punitive damages in the absence of such an express grant of authority.

¶ 86    The sole case permitting the imposition of a punitive damages award is *Page v. City of Chicago*, 299 Ill. App. 3d 450 (1998), in which the First Division of the First District Appellate Court found that the Chicago Human Rights Ordinance authorizes the imposition of punitive damages despite the lack of an express grant of authority. This case has been cited recently by our Fourth Division in *1212 Restaurant Group, LLC v. Alexander*, 2011 IL App (1st) 100797, both of which Boyd relies on in support of her argument.

¶ 87    In *Page*, the court considered whether a complainant who prevailed on her sexual harassment claim against her employer was permitted to receive an award of punitive damages under the Chicago Human Rights Ordinance. As in the instant case, the court there considered whether Chicago's Commission on Human Relations was authorized to award punitive damages. The ordinance provided that " '[r]elief may include but is not limited to an order: *** to pay actual damages, as reasonably determined by the Commission, for injury *** suffered by the complainant.' " *Page*, 299 Ill. App. 3d at 463 (quoting Chicago Municipal Code § 2-120-510(*l*) (1990)). The *Page* court noted that courts defer to an agency's interpretation of the statute that it is charged to enforce; that a statute must be interpreted within the plain meaning of the statute's words; and that the purpose of awarding punitive damages was to punish the individual responsible, to teach the individual not to repeat the conduct, and to deter others from similar conduct. *Page*, 299 Ill. App. 3d at 463.

¶ 88    The court observed that the ordinance called for such " 'relief as may be appropriate' " and did not limit the relief to specific damage categories or exclude punitive damages. *Page*, 299 Ill. App. 3d at 463 (quoting Chicago Municipal Code § 2-120-510(*l*) (1990)). The court further noted that the Chicago Commission on Human Relations had interpreted the language of the ordinance to include the authority to impose punitive damages, and that the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1994)) contained similar language for relief and had been interpreted to include punitive damages. *Page*, 299 Ill. App. 3d at 463-64. Finally, the court stated:

> "[P]unitive damages constitute an appropriate remedy for acts of sexual discrimination and harassment. By awarding punitive damages in cases of sexual harassment and discrimination, the Commission can punish individuals responsible for the wrongful conduct, prevent them from sexually harassing or discriminating against others, and deter others from committing similar acts. We cannot find any reason that the City would exclude the ability to recover punitive damages in an area where it would be highly appropriate and necessary." *Page*, 299 Ill. App. 3d at 464.

The court distinguished the Chicago ordinance from the Human Rights Act, noting that "[u]nlike the Ordinance at issue, *** the Human Rights Act expressly limits its remedies to relief identified within the Act." *Page*, 299 Ill. App. 3d at 464 (citing 775 ILCS 5/8A-104 (West 1996)). *Page*'s holding that punitive damages were available was followed by *1212 Restaurant Group*, which upheld a punitive damages award without separate consideration of whether the Chicago ordinance permitted punitive damages. *1212 Restaurant Group*, 2011

-22-

IL App (1st) 100797, ¶ 63. We note that no Illinois case other than *1212 Restaurant Group* has cited *Page* for any issue concerning punitive damages awarded by an administrative agency.

¶ 89 After considering the applicable law, we find that we cannot apply the holding of *Page* to the Ordinance at issue here. While *Page* noted that the Chicago Commission on Human Relations was an administrative agency, it did not discuss the Illinois Supreme Court's ruling that an administrative agency is a creation of statute and is limited in its powers. See *Vuagniaux*, 208 Ill. 2d at 186. Additionally, we cannot agree that the fact that the Consumer Fraud and Deceptive Business Practices Act has been interpreted to permit punitive damages, which was relied upon by the *Page* court, is persuasive. A violation of the Consumer Fraud and Deceptive Business Practices Act gives rise to an action in a court, where a judge decides the applicability of punitive damages, not an administrative agency. See 815 ILCS 505/10(a) (West 2010) ("Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper ***."). Thus, the question of the availability of punitive damages occurs in an entirely different context.

¶ 90 As noted, we have not discovered any other case in which an administrative agency was permitted to impose punitive damages in the absence of an express grant of authority to do so. While we agree with the *Page* court that punitive damages may be "highly appropriate and necessary" (*Page*, 299 Ill. App. 3d at 464) for certain violations of the Ordinance, that decision should be left to the legislature and cannot be made by the Commission in the absence of authority to do so.

¶ 91 We are also unpersuaded by the fact that the Commission itself has determined that it has the authority to award punitive damages for violations of the Ordinance. In *Gluszek v. Stadium Sports Bar & Grill*, Cook County Comm'n on Human Rights No. 1993E052 (Decision & Order Mar. 16, 1995), the Commission found that it had the right, in appropriate circumstances, to award punitive damages. While a reviewing court affords substantial deference to an agency's interpretation of a statute which the agency administers, because of the experience and expertise the agency has gained through time by enforcing the statute (*Phelan v. Village of LaGrange Park Police Pension Fund*, 327 Ill. App. 3d 527, 531 (2001)), "[t]he determination of the scope of the agency's power and authority is a judicial function and is not a question to be finally determined by the agency itself" (*Masterson*, 188 Ill. 2d at 554).

¶ 92 Here, we cannot agree with the Commission's determination that it may award punitive damages. In *Gluszek*, the Commission relied on the same arguments made by Boyd here–that the remedies listed in the Ordinance are expressly nonexclusive, that the Ordinance provides it should be liberally construed, and that the analogous Chicago ordinance is interpreted to permit punitive damages.[3] Since we have explained why those arguments are unpersuasive,

---

[3]*Gluszek* was decided prior to the appellate court's decision in *Page*, so it relies on citations to decisions of the Chicago Commission on Human Relations in its analysis.

we do not find that the Commission's decision requires us to interpret the Ordinance in the same way as it did.

¶ 93    Finally, we do not find Boyd's argument that the conduct in the case at bar was sufficient to warrant punitive damages to be persuasive. As noted, when a statute does not expressly discuss punitive damages, common law punitive damages may be available if warranted by the facts of the case. See, *e.g.*, *Vincent*, 241 Ill. 2d at 502. Here, common law punitive damages are not available because the Commission is an administrative agency and "has no general or common law authority." *Vuagniaux*, 208 Ill. 2d at 186. Additionally, even if common law punitive damages were available or the Ordinance authorized punitive damages, the Commission would have needed to find that Crittenden's conduct was particularly egregious. See *Kelsay*, 74 Ill. 2d at 186 ("punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others"). In the case at bar, the Commission simply stated that it compared Crittenden's conduct with the conduct of a defendant in an earlier Commission case and determined that a $5,000 punitive damages award was appropriate. The Commission did not make a finding that Crittenden's conduct constituted malice. Punitive damages may be an appropriate remedy for acts of sexual discrimination and harassment, but in order for an administrative agency to award such damages, the legislature should expressly give the agency the power to award them and the criteria to use.

¶ 94                                          CONCLUSION

¶ 95    For the foregoing reasons, we affirm the circuit court's order denying petitioners' petition for *certiorari* and confirming the decision of the Commission. However, we reverse the Commission's award of punitive damages, finding they are not available under the Ordinance.

¶ 96    Affirmed in part and reversed in part.